DONA M. KERINS *vs*. JOHN LIMA & another.[1]

Barnstable. April 10, 1997. - June 3, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & FRIED, JJ.

*Statute,* Construction. *Common Law. Parent and Child,* Parental liability
for intentional act of child. *Words,* "Parents."

The word "parents" in G. L. c. 231, § 85G, which holds parents responsible
for the wilful acts of a child under the age of eighteen resulting in
personal injury or property damage, does not include foster parents,
construing the term narrowly and in light of legislative intent reflected in
the statute's legislative history. [110-116]

CIVIL ACTION commenced in the Barnstable Division of
the District Court Department on August 4, 1995.

The case was heard by *John C. Wheatley*, J., on a motion
to dismiss.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Kevin M. Orme* for the plaintiff.

*Andrew S. Berman* for the defendants.

*Scott Harshbarger*, Attorney General, & *Loretta M. Smith*,
Assistant Attorney General, for the Attorney General, amicus
curiae, submitted a brief.

GREANEY, J. General Laws c. 231, § 85G, reads as follows:

> "Parents of an unemancipated child under the age of
> eighteen and over the age of seven years shall be liable
> in a civil action for any willful act committed by said
> child which results in injury or death to another person
> or damage to the property of another, which shall
> include any damages resulting from a larceny or at-
> tempted larceny of property as set forth in [G. L. c. 266,

---

[1]His wife, Jean Lima.

§ 30A], damage to cemetery property or damage to any state, county or municipal property or damage as set forth in [G. L. c. 266, §§ 126A and 126B]. This section shall not apply to a parent who, as a result of a decree of any court of competent jurisdiction, does not have custody of such child at the time of the commission of the tort. Recovery under this section shall be limited to the amount of proved loss or damage but in no event shall it exceed five thousand dollars."

The plaintiff brought an action under the statute in the District Court against the defendants, alleging that the defendants, as the "parents" of Christopher Rule, a juvenile, were responsible for damages because of Rule's participation with two other juveniles in an arson that destroyed a building owned by the plaintiff. At the time of the incident, the defendants were the foster parents of Rule, who resided with them under the foster care program administered by the Department of Social Services (department). The defendants filed a "Motion to Dismiss and/or for Summary Judgment," on the ground that G. L. c. 231, § 85G, did not apply to foster parents. A judge in the District Court allowed the motion.[2] The Appellate Division of the District Court affirmed the judge's decision and ordered the plaintiff's appeal dismissed.[3] The plaintiff then took an appeal to the Appeals

---

[2] The judge did not indicate whether he decided the motion solely as a motion to dismiss or whether he treated it as a motion for summary judgment based on an affidavit furnished by the defendants. The judgment indicated that it was based on the defendants' motion to dismiss.

[3] The Appellate Division entered with its decision and order the following brief opinion:

> "This matter arises from an arson fire set by the juvenile foster child of the defendants (Lima). The child was placed in the Lima's home by reason of an agreement with [the department]. There is nothing in the record to indicate who had legal custody. We may, from the facts, infer that [the defendants] had physical custody. The plaintiff is seeking redress against the Limas on the basis of M. G. L. c. 231 sec. 85G [which] holds parents responsible for the wilful acts of a child under the age of [eighteen] which results [*sic*] in injury or death to another. The Trial Justice allowed the [defendants'] motion to dismiss and we affirm.
>
> "The juvenile was in the Lima home as part of the statutory scheme of M. G. L. c. 119 sec. 21, to provide temporary care for

Court, and we transferred her appeal to this court on our own motion. We affirm the order of the Appellate Division.

It is undisputed that, at the time of the arson, the defendants were foster parents of Rule under a contractual agreement with the department. The dispositive question is whether the word "parents" in G. L. c. 231, § 85G, includes foster parents. In deciding that question, we keep certain principles in mind. Since G. L. c. 231, § 85G, derogates from the common law, it therefore is to be strictly construed, *Falmouth Ob-Gyn Assocs., Inc.* v. *Abisla*, 417 Mass. 176, 179 (1994), and a court "will not presume that the Legislature intended . . . a radical change in the common law without a clear expression of such intent." *Commercial Wharf E. Condominium Ass'n* v. *Waterfront Parking Corp.*, 407 Mass. 123, 129 (1990), *S.C.*, 412 Mass. 309 (1992).[4] We consider such a statute in the light of the common law that it superseded, in an attempt to discern the meaning of the term "parents." See *Commonwealth* v. *Burke*, 392 Mass. 688, 690 (1984) ("examination of its common law roots provides guidance in discerning the meaning of [a] term"); *Trustees of the N.Y., N.H. & H.R.R.* v. *New Bedford*, 315 Mass. 154, 157 (1943).

At common law, in the absence of an agency relationship, a parent was not vicariously liable for the tort of a child unless the parent directed, encouraged, or ratified the child's conduct. W.P. Prosser & R.E. Keeton, Torts § 123, at 913-914 (5th ed. 1984). In the Commonwealth, parents also were held liable for a child's intentional acts when the parent knew or should have known of the child's propensity for the type of harmful conduct with which the child was charged but failed to take reasonable corrective measures. See *DePasquale* v. *Dello Russo*, 349 Mass. 655, 658 (1965), and cases cited. Absent evidence of such a "dangerous tendency," however, li-

---

homeless children. The Limas were paid to care for the juvenile by the Commonwealth. There is no language in the statute or elsewhere that indicates that the temporary care giver should be liable for the conduct of a temporary foster child or be made an insurer therefor.

"We, therefore, *affirm.*"

[4]The plaintiff argues that, because the statute is remedial, it should be broadly construed. We are not convinced that the purpose of the statute is totally remedial; it could be argued that strict liability has a punitive import. Regardless of any remedial nature, the fact that the statute effects a material change in the common law requires we construe it strictly. See *Guaranty-First Trust Co.* v. *Textron, Inc.*, 416 Mass. 332, 336 (1993).

ability was not imposed. *Id.* at 659, and cases cited (declining to "expose[] parents to liability for the torts of their children solely because of their parenthood"). See *Smith* v. *Jordan*, 211 Mass. 269, 270 (1912) ("A father is not liable for the torts of his minor son, simply because of paternity"). Thus, under the common law before the enactment of G. L. c. 231, § 85G, a parent could not be held vicariously liable for the intentional acts of a child solely on the basis of his or her status as a parent.

In enacting G. L. c. 231, § 85G, however, the Legislature changed this common law rule and imposed strict liability on the parent for the intentional acts of his or her child. This was a radical change in the common law. We therefore construe the term "parent" narrowly, see *Commercial Wharf, supra*, and apply its ordinary meaning, "unless there is something in the statute indicating [it] should have a different significance." *Meunier's Case*, 319 Mass. 421, 423 (1946). See *Jancey* v. *School Comm. of Everett*, 421 Mass. 482, 490 (1995), quoting *Westinghouse Broadcasting Co.* v. *Commissioner of Revenue*, 382 Mass. 354, 357 (1981) ("[a]s the statute does not effectively define [the term 'parent'] . . . the Legislature should be supposed to have adopted the common meaning of the word, as assisted by a consideration of the historical origins of the enactment").

The ordinary meaning of the word parent is "[t]he lawful father or the mother of a person." Black's Law Dictionary 1269 (4th ed. 1951).[5] There is nothing in G. L. c. 231, § 85G, to indicate that the word should have a different or supplemental meaning. The ordinary meaning of the term "parent" does not include individuals, such as foster parents, who are not the lawful parents of the child, but merely act in a parental capacity because of a temporary contractual agreement with the State; the relationship between parent and

---

[5]The plaintiff argues for a more expansive definition of this term, citing Black's Law Dictionary 1114 (6th ed. 1990). Although the definition preferred by the plaintiff could be read to include individuals other than the mother and father of a child, nonetheless, the edition of Black's Law Dictionary cited in the text is the edition that would have been available to the Legislature at the time that the original statute was enacted. See St. 1969, c. 543. We conclude that the definition we apply above is the one intended by the Legislature.

child is not contractual, it is familial.[6] As we have noted above, the historical origin of the enactment of G. L. c. 231, § 85G, was to redress the common law situation described in *DePasquale* v. *Dello Russo, supra.* We conclude that the term "[p]arents" in the statute does not include foster parents. See *Edgar H. Wood Assocs., Inc.* v. *Skene*, 347 Mass. 351, 362 (1964), quoting *Commonwealth* v. *Welosky*, 276 Mass. 398, 403 (1931), cert. denied, 284 U.S. 684 (1932) ("statutes do not govern situations not within the reason of their enactment and giving rise to radically· diverse circumstances presumably not within the dominating purpose of . . . [their framers]").

Our conclusion is bolstered by an examination of the statute's legislative history. The statute was the ultimate by-product of a bill submitted to the Senate and two bills submitted separately to the House of Representatives. The bill introduced in the Senate, 1969 Senate Doc. No. 651, sought to impose unlimited liability for the wilful torts of all minors on "a parent *or guardian* having the custody of [the] minor" (emphasis added). The first House bill, 1969 House Doc. No. 322, would have imposed liability on "parents having custody *or control* of the minor" for the minor's wilful misconduct in an amount not to exceed $500 (emphasis added). Both of these versions imposed broader liability than did any of the successor bills proposed to or passed by the Legislature. A

---

[6]While foster parents may act in a parental capacity, they do so only on a temporary basis and are not ultimately responsible for the child who has been placed in their care. Those selected to be foster parents execute a written contract with the department in which they agree to furnish care to a foster child or children. The contract and the applicable agency regulations define the role and authority of the department and provide "a statement of the responsibilities of the foster parent, including a recognition that foster care is a temporary arrangement which envisions the eventual reunification of the child with his/her natural family and the obligation of the foster parent to support that reunification." 110 Code Mass. Regs. § 7.111 (1) (1993). The department recognizes the distinction between legal parent and foster parent: the department's regulations specifically provide that "the parent of a child to be placed in foster care is not eligible to be a foster parent applicant for that child." 110 Code Mass. Regs. § 7.100 (1993). Further, unlike a child's legal parent, a foster parent serves at the pleasure of the department: an application to become a foster parent can be rejected, and even after placement, a child can be removed from a foster home. 110 Code Mass. Regs. §§ 7.107, 7.113 (1) (c) (5) (1993). Foster parents are, therefore, temporary contract service providers with a defined set of rights and responsibilities that clearly differs from those of a child's parents. See *Andrews* v. *County of Otsego*, 112 Misc. 2d 37, 41-42 (N.Y. Sup. Ct. 1982).

second House bill, 1969 House Doc. No. 2511, imposed liability on the "[p]arents of children under the age of fourteen years" for "the torts committed by said children" in an amount not to exceed $4,000, but exempted from liability "a parent not having custody of such a child at the time of the commission of the tort as a result of a decree of the probate court . . . or a court of another competent jurisdiction." The three bills were referred to the House Committee on the Judiciary, which reported out 1961 House Doc. No. 5214. This bill imposed liability on the "[p]arents of unemancipated children under the age of seventeen years" for the wilful misconduct of such children and contained the exemption, set forth in 1969 House Doc. No. 2511, for a parent who did not have custody. The bill was superseded by 1969 House Doc. No. 5275, which imposed liability on "[p]arents of an unemancipated child under the age of seventeen and over the age of seven" for wilful acts causing personal injury or property damage in an amount not to exceed $1,000, and continued to exempt parents "who [did] not have custody of [the] child, at the time of the commission of the tort, as a result of a decree of any court of competent jurisdiction." This bill ultimately was enacted as the statute after a change that decreased the amount of recovery from $1,000 to $300. St. 1969, c. 453. Since its enactment, G. L. c. 231, § 85G, has been amended seven times to increase the maximum amount of recovery to $5,000, to expand the types of property damage covered, and to increase the age of the minor children covered to eighteen years.[7] The language making only the "[p]arents of an unemancipated child" liable for wrongdoing has remained the same since 1969.

While not definitive, we think the language deleted from the predecessor bills to St. 1969, c. 453, supports our conclusion that the statute did not contemplate imposing strict liability on foster parents. The language in 1969 Senate Doc. No. 651, imposing liability on a "guardian having the custody," was eliminated from the bill when it was reported out of committee, as was the provision imposing liability for the acts of a child under the parent's "control" in 1969 House Doc. No. 322. The final bill requires both parentage and

---

[7]The amendments are contained in St. 1972, c. 552; St. 1975, c. 189; St. 1979, c. 172; St. 1983, c. 97; St. 1985, c. 442; St. 1986, c. 335, § 1; and St. 1995, c. 60, § 165.

custody as prerequisites for the imposition of strict liability. The evolution of the statute, from one that established relatively broad liability to one that imposed liability only on the "[p]arents of an unemancipated child," further suggests a legislative intent not to include within the ambit of the statute caretakers of children who may have responsibility for, or may stand in some way in loco parentis to, a minor.

We also note additional evidence of the Legislature's intent that the statute apply exclusively to a child's parents, as that term is commonly used. First, the bill that became the statute (1969 House Doc. No. 5275) was entitled "An Act providing that parents shall be liable for damages resulting from certain acts of wilful misconduct by *their* minor children" (emphasis added). The title suggests that parents would be held liable for the wilful acts of their own children and not the children of others for whom they might be providing care. See *Commissioner of Corps. & Taxation* v. *Chilton Club*, 318 Mass. 285, 292 (1945) (title is "a part of the act, and resort may be had to it as an aid in [its] interpretation"). Second, the exemption from liability in the statute for a parent who does not have "custody" of the child "as a result of a decree of any court of competent jurisdiction" appears to address the issue of the possible liability of a noncustodial parent under a divorce judgment, a situation that has no relevance to foster parents. Third, in statutes enacted prior to the adoption of G. L. c. 231, § 85G, the Legislature, when it wanted to broaden the definition of the word "parent" beyond its ordinary meaning, took care to state the scope of the class intended.[8] Fourth, statutes enacted after the adoption of G. L. c. 231, § 85G, continue to reflect the Legislature's under-

[8]See, e.g., G. L. c. 118, the statute providing for "Aid to Families with Dependent Children," which in § 1 (inserted by St. 1936, c. 413, § 1, and amended through St. 1957, c. 430) defines "parent" to "include, in addition to the father and mother of the dependent child, the following: — stepfather, stepmother, stepbrother, stepsister; any blood relative, including those of the half blood, except cousins who are more distantly related than first cousins; adoptive relative of equal propinquity to the foregoing; and spouses of any such persons." See also G. L. c. 119, the statute authorizing the Commonwealth to take custody of abused and neglected children and place them in foster care, which defines a "parent" in § 21 (inserted by St. 1954, c. 646, § 1) as a "mother or father, unless specified [as a] parent" under G. L. c. 118, § 1; G. L. c. 231, § 85D (inserted by St. 1945, c. 352, § 1), providing that the negligence of a "parent or other custodian of [an] infant shall not be imputed to the infant" in a tort action; G. L. c. 149,

standing that the ordinary meaning of "parent" is mother and father and that, when the word is intended to have a broader meaning, it is usually appropriate to provide a definition.[9] Thus, the term "parent" appears to have " 'acquired a peculiar and appropriate meaning in law' [and] we are bound to give the word that meaning." *Levin* v. *Wall*, 290 Mass. 423, 425 (1935), quoting G. L. c. 4, § 6, Third.

Finally, we note that it does not seem proper to import into the responsibilities of foster parents an obligation of liability for wilful misconduct by foster children given over to their care. There exists a chronic shortage of families willing to provide foster care. Holding foster parents liable under G. L. c. 231, § 85G, would have a chilling effect on the willingness of families to open their homes to children in need of care and would make it considerably more difficult for the department to provide appropriate, noninstitutionalized care for children whose natural parents cannot provide adequately for them. We doubt that the Legislature intended a result that is so clearly contrary to the public policy supporting the needs of children. Further, if G. L. c. 231, § 85G, seeks to hold parents responsible if they fail adequately to supervise their children, the statute's interests would not be substantially advanced by extending liability to foster parents.[10]

---

§ 81 (inserted by St. 1913, c. 831, § 23) punishing certain conduct under the child labor laws by "[a]ny parent, guardian or custodian having a minor under his control . . . ."

[9] See, e.g., G. L. c. 112, § 12F (referring to "parent . . . guardian or other person having custody or control of a minor child"); G. L. c. 209B, § 1 (defining "[p]arent" to include "a biological, foster, or adoptive parent whose parental rights have not previously been terminated"). See also G. L. c. 15C, § 3 (defining "[p]arent" as "any parent, legal guardian or sponsor of a student"); G. L. c. 233, § 20 ("the term 'parent' shall mean the natural or adoptive mother or father of said child"). Cf. G. L. c. 127, § 90A ("the word 'relative' shall mean the committed offender's father, mother, child, brother, sister, husband or wife and, if his grandparent, uncle, aunt or foster parent acted as his parent in rearing such committed offender, it shall also mean such grandparent, uncle, aunt or foster parent").

[10] In an opinion to the State Secretary of Employment and Social Services, the Attorney General of Maryland concluded that foster parents should not be liable for the wrongful acts of foster children. In the course of the opinion, the Attorney General stated the following, which has pertinence to the interpretation we place on G. L. c. 231, § 85G:

For the reasons stated, we conclude that G. L. c. 231, § 85G, does not apply to foster parents. The order of the Appellate Division is affirmed.

*So ordered.*

"[W]hile it may be that, as against innocent third parties, persons who bear and raise a child should carry the financial burden of that child's wrongdoing, it is exceedingly more difficult to reach the same result when weighing the relative innocence of injured third parties against that of persons who, at the request of their government and without profit, are temporarily providing a home for an unrelated child. Under such circumstances the relative equities do not necessarily weigh in favor of the injured party. Moreover, because foster parents may not share the relatively unfettered freedom which natural and adoptive parents enjoy over their own children, and since a foster child's tortious behavior may well stem from the very problems which caused him to be placed in foster care in the first instance, the deterrent effect of such legislation is arguably misdirected at foster parents" (footnote omitted). 59 Annual Report and Official Opinions of the Attorney General of Maryland 356, 361-362 (Mar. 5, 1974).