McHugh, J.
Plaintiff was injured when she was thrown from a horse named “Cherokee” during a riding lesson at defendant’s riding stable. She claims that the riding instructor, whom all agree was an employee of defendant acting in the course of his employment, negligently failed to assess her ability to manage “Cherokee” and that the accident occurred as a result. Defendant has moved for summary judgment claiming that G.L.c. 128, §2D exempts it from liability.
In accordance with Superior Court Rule 9A(b)(5), defendants filed a statement of undisputed material facts containing 26 separate paragraphs. Plaintiff disputed only one of those, ¶15, although, in her brief, plaintiff set out some additional facts she claims are in dispute. The undisputed facts, even considered in the context of the additional facts plaintiff claims are disputed, show, as a matter of law, that defendant was not negligent with respect to anything it did or failed to do before plaintiff mounted “Cherokee” for a lesson on the day she was thrown. More specifically, there is no genuine issue of material fact with respect to whether the defendant failed to assess properly plaintiffs ability to manage “Cherokee” before allowing her to ride him.
Plaintiff alleges, however, that “Cherokee” was nervous and was “twittering [and] twitching" during the course of her lesson, that “Cherokee” stubbornly refused to follow her instructions while the lesson progressed and that she found it difficult to control him. Plaintiff maintains that the instructor knew, or should have known, of “Cherokee’s” obstinate behavior and, given plaintiffs level of experience, should have stopped the lesson or should have replaced “Cherokee” with a different horse. Defendant’s failure to take either step, plaintiff maintains, was negligent and was outside of the immunizing provisions of c. 128.
Pertinent provisions of c. 128, §2D are as follows:
Except as provided in subsection (c), . . . an equine professional, or any other person, which shall include a corporation or partnership, shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities and, except as provided in said subsection (c), no participant or participant’s representative shall make any claim against, maintain an action against, or recover from ... an equine professional, or any other person for injury, loss, damage, or death of the participant resulting from any of the inherent risks of equine activities.
G.L.c. 128, §2D(b).
There is no doubt that defendant was “an equine professional” as that term is used in the statute. Likewise, there is no doubt that the riding lesson in which plaintiff was participating at the time she was thrown from “Cherokee” was an “equine activity” as that term is used in the statute. The term “inherent risks of equine activities" is defined in the statute as follows:
[D] angers or conditions which are an integral part of equine activities, including but not limited to:
(1) The propensity of equines to behave in ways that may result in injury, harm, or death to persons on or around them; (2) the unpredictability of an equine’s reaction to such things as sounds, sudden movement, and unfamiliar objects, persons, or other animals: (3) certain hazards such as surface and subsurface conditions: (4) collisions with other equines or objects; (5) the potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within his ability.
G.L.c. 128, §2D(a).
Subsection (c) contains several exceptions, the material portions of which are as follows:
Nothing in subsection (B) shall prevent or limit the liability of an ... an equine professional, or any other person if the . . . equine professional, or person:
(1) . . . (ii) provided the equine and failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity, and determine the ability of the participant to safely manage the particular equine based on the participant’s representations of his [or her] ability.
Plaintiff contends that the instructor’s failure to stop the lesson or supply her with a different horse after the instructor knew, or should have known, that she was having difficulty managing “Cherokee” is conduct contemplated by subsection (c)(l)(ii) and strips the defendant of the protection otherwise afforded by subsection (b).
Chapter 128, §2D is a relatively new statute, has not yet been construed by an appellate court and is anything but a model of clarity. A particular difficulty with the statute relevant to the facts of this case concerns the time when the equine professional must make the “reasonable and prudent efforts" subsection (c)(1)(H) describes.[1] One could argue that, as long as the equine professional makes reasonable and prudent efforts to match horse with rider before permitting the rider to mount, what happens thereafter simply manifests the propensity of horses to do strange and unpredictable things and is thus an “inherent risk” the statute insulates from liability.
Statutes that derogate from the common law, however, are to be strictly construed, at least as long as a strict construction is not inconsistent with the objectives the legislation itself reveals. E.g., Kerins v. Lima, 425 Mass. 108, 110 (1997); Falmouth Ob-Gyn Assocs., Inc. v. Abisla, 417 Mass. 176, 179 (1994). The legislative goal embodied in subsections (b) and (c)(l)(ii) was not absolute immunity from liability but a more limited immunity from liability for the vagaries of equine *545 behavior as long as the equine professional made a reasonable effort to match a rider’s skills to the challenges a particular horse engaged in a particular activity was likely to provide.
Holding that subsection (c)(1)(ii) has nothing to do with what happens after a rider mounts up would immunize an equine professional from liability no matter what the horse did under the professional’s watchful gaze after a lesson’s commencement. But horses, like humans, can have bad days. Sometimes, the fact the horse is having a bad day, and therefore may be particularly difficult to manage, manifests itself before the horse actually does anything untoward. Sometimes it does not. If it does and if the manifestation would put a reasonable equine professional on notice that a rider of the caliber on the horse’s back should then not be there, it is surely consistent with the statute’s limited objective to require the professional to take the rider off.
In my view, therefore, a proper construction of the statute imposes on the equine professional a continuing duty to determine whether, under the circumstances that actually appear during the course of a given lesson, the participant has the ability to engage safely in the equine activity the equine professional is supervising. Construing the statute in that fashion does not rob its of its vitality. The broad exemption from liability provided by subsection (b) remains intact except to the extent that the equine professional becomes, or should become, aware that the rider does not have the ability to engage safely in the day’s equine activities as those activities progress.
The question in each case, therefore, is not whether the professional gave a particular negligent direction, not whether the professional failed to communicate instructions with reasonable care and not whether the professional failed to anticipate a particular horse’s reaction to a particular stimulus. The question is not even whether the rider has displayed a pattern of inattentiveness during the course of a given lesson.[2] Instead, the question is whether the horse’s behavior during the course of a particular activity was sufficient to put the professional, or a reasonable professional in his or her place, on notice that, on that day and at that time, the particular rider did not have sufficient ability to engage safely in the activities the professional was supervising.[3]
ORDER
In light of the foregoing, it is hereby ordered that defendant’s motion for summary judgment should be, and it hereby is, allowed in part and denied in part. The absence of defendant’s negligence for any act or omission before plaintiff mounted “Cherokee” on the day of the accident is established. See Mass.R.Civ.P. 56(c). There remains, however, a genuine issue of material fact as to whether defendant failed “to make reasonable and prudent efforts to determine the ability of the [plaintiff] to engage safely” in the lesson defendant was supervising between the time plaintiff mounted “Cherokee” at the lesson’s beginning and the time the accident occurred.

Another interpretive difficulty arises from the fact that subsection (c) (1) (ii) contains two clauses. Theoretically, one could argue that an equine professional is not removed from the protective embrace of subsection (b) unless he or she fails to make the determinations described in both of those clauses. Under that interpretation, if the equine professional, say, “failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity” but did “make reasonable and prudent efforts to ... determine the ability of the participant to safely manage the particular equine based on the participant’s representations of his ability,” subsection (c) would be inapplicable and the exclusion from liability contained in subsection (b) would apply. To read the statute in that fashion, in my view, would be inconsistent with the natural reading statutory language is entitled to receive, see, e.g., Victor V. v. Commonwealth, 423 Mass. 793, 794 (1996); Tesson v. Commissioner of Dept. of Transitional Assistance, 41 Mass.App.Ct. 479, 482 (1996), particularly because failures of a type described in the second clause are a subcategory of the kinds of failures described in the first clause. Accordingly, I am of the opinion that a failure of a type described in either clause is sufficient to trigger the exclusion.

The rider’s lapses, after all, are defined in the statute as part of the “inherent risks of equine activities.” C. 128, §2D(a) (“inherent risks of equine activities” include “(5) the potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within his ability”).

That determination may well require expert testimony in most cases. I make no judgment, one way or the other, as to whether expert testimony is necessary in this case because counsel have not had an opportunity to address themselves to that issue.