Fecteau, Francis R., J.

INTRODUCTION

The plaintiffs, Audrey S. Serrano, individually and as next friend of Jessica Paskell-Serrano, have brought this action against the defendants, Massachusetts Department of Social Services (“DSS”), DSS employees Deborah Chapman, Susan Billings, Priscilla Hayes, and Kathleen Hazelton (the “DSS defendants”), Hillcrest Educational Centers, Inc. (“Hillcrest”), and Hillcrest employees Amy M. Tunis, Shaun V. Cusson and Maighan McKie[3] (the “Hillcrest defendants”). As to the DSS defendants, the plaintiffs allege negligent placement, negligent supervision, false imprisonment, intentional interference with parental rights, loss of consortium and violations of the Massachusetts Civil Rights Act. As to the Hillcrest defendants, the plaintiffs allege intentional interference with parental rights, negligence, negligent supervision/respondeat superior, false imprisonment, assault and battery, loss of consortium and violations of the Massachusetts Civil Rights Act. In separate motions, the DSS defendants and the Hillcrest defendants have moved for summary judgment on all of the plaintiffs’ claims.[4] The parties were heard on November 20, 2006.[5] For the following reasons, the defendants’ motions are ALLOWED.

BACKGROUND

The summary judgment record, considered in the light most favorable to the non-moving party, reveals the following undisputed facts:
Jessica Paskell-Serrano was born on January 9, 1990. Plaintiff Audrey Serrano is Jessica’s maternal aunt. Audrey received permanent custody of Jessica when Jessica was two years old, and formally adopted her in April 2002. Jessica has had behavioral problems since she was a young child. Additionally, she has a learning disability and was physically and sexually abused from an early age, before she had any involvement with any of the defendants in this case.
As early as 1994, Audrey voluntarily sought out the assistance of DSS to help Jessica with her difficult behavioral problems. Pursuant to voluntary placement agreements entered into between DSS and Audrey from 1994 through 1999, both parties worked cooperatively in selecting out-of-home placement for Jessica.
In 1998, Jessica was placed at a residential facility through one of these voluntary placement agreements. In September 1998, defendant Deborah Chapman was the social worker assigned to Jessica’s case. Defendant Susan Billings was Chapman’s supervisor at DSS. By this point, Jessica’s poor behavior had escalated to include sexually provocative behavior, feces smearing, and aggressive behavior towards others. There were two more voluntary placements, from September 24, 1998 to October 22, 1998, and November 9, 1998 through January 18, 1999, at the Bridge Home in Worcester. While at the Bridge Home, Jessica’s behavior improved. However, upon returning home, Jessica’s behavior would worsen and Audrey again requested residential placement for Jessica. Audrey and DSS then entered into another voluntary placement agreement which returned Jessica to the Bridge Home.
Jessica’s behavior improved at the Bridge Home, and Bridge Home employees did not witness any of the behavior that Audrey had reported was taking place at home. Because of this, the Bridge Home opposed Jessica’s returning home and recommended therapeutic foster care. On April 5, 1999, defendants Chapman and Billings explained to Audrey the recommendation and offered Jessica specialized care in a Dare home. Audrey was unhappy with this suggestion, and refused it. Audrey felt that DSS was acting unreasonably and trying to keep her away from Jessica. Audrey then notified DSS that she would be closing her case wfith DSS, bringing Jessica home, and refusing any foster care placement for Jessica. She felt that DSS was improperly attempting to keep Jessica away from her and essentially holding her against her will. The next day, defendant Chapman filed an affidavit in Fitchburg District Court seeking custody of Jessica on behalf of DSS, which the court temporarily granted. Defendant Chapman picked up Jessica from school that day and as of April 6, 1999, had legal custody of her.
On April 9, 1999 a 72-hour hearing was held. Audrey appeared and was provided with counsel. The hearing was continued until April 30, 1999, then until May 11, 1999, and finally until May 14, 1999. At the May 14, 1999 hearing, Audrey, who was represented by counsel, waived her rights to the 72-hour hearing. Eventually, in November 2001, the Fitchburg Juvenile Court adjudicated Jessica in need of care of protection and ordered custody to DSS. Audrey signed a stipulation with DSS on November 21, 2001, agreeing that Jessica was in need of care and protection and that she was unable to meet Jessica’s needs.
While DSS was awarded temporary custody of Jessica, it used Dare Family Services, Inc. (“Dare”) to place her in a foster home. DSS contracted with Dare to provide placement for children that required a high *503 level of supervision. Jessica was placed in a “Mentor Program” whereby mentors were assigned only one foster child and provided constant supervision and child specific treatment within the home. DSS would provide Dare with information about a referred child, and Dare would then place the child in an approved mentor home. Before a person could become a mentor, there is a formal process involving criminal background checks, home studies, and a forty-hour training program. Dare then assigns each referred child with a mentor. DSS has no direct involvement with Dare’s mentor recruitment, training, or matching process, and did not supervise Dare Mentors. However, children in placed in Dare homes by DSS remain in the custody of DSS.
Dare placed Jessica with six separate mentors. From April 13, 1999 until May 4, 1999, Jessica was placed with Valerie Savoie; from May 5, 1999 until August 6, 1999, with Leslie Vargas; from August 7, 1999 until August 18, 1999, with Jennifer Cox; from August 19, 1999 until September 21, 1999, with Ruth Santiago; from September 22, 1999 until October 17, 1999, with Grace Lane; and from October 18, 1999 until October 24, 1999, with Sonya Marquez. Only the aforementioned mentors were approved caregivers in their respective homes. The mentors’ spouses or other people in the home were not approved by Dare. Dare conducted studies of the mentors’ homes before approving them as mentors, and these studies revealed no problems before Jessica was placed in each home. The record discloses no evidence that any of the moving parties knew or should have known of reasons to believe or suspect of prior inappropriate behaviors on the part of any adult in any of these placements.
On June 20, 1999, defendant Chapman, Lisa Seeley from Dare, Leslie Vargas, and Audrey met at the DSS office to address Leslie Vargas’s concern that Audrey was trying to sabotage the placement. Ruth Santiago would also request that Jessica be moved because of Audrey’s interference with the placement. By September of 1999, Jessica’s behavior had again deteriorated and she became physically aggressive and was assaulting other children in the mentor’s home. Jessica was placed with a string of mentors during this time period. It was clear that Jessica would need to be removed from the Dare mentor program. A residential placement was secured for Jessica at the Hillcrest Educational Center (“Hillcrest”), but there was a six- to eight-week waiting list. Eventually, because of her behavioral problems, Jessica was removed from the Dare mentor program and placed in the Bridge Home during the waiting period before she could be placed at Hillcrest.
On October 21, 1999, Dare mentor Sonya Marquez brought Jessica to a health clinic where it was revealed that Jessica had a genital wart and a vaginal infection. Dr. Karos, who diagnosed Jessica, had previously examined Jessica in February 1999, but did not get a good look at Jessica’s vaginal area. Defendant Chapman spoke with Jessica on February 25, 1999, and Jessica stated that the last time she was touched inappropriately by anyone was when she was three years old.
On October 21, 1999, Audrey learned that Jessica was diagnosed with a genital wart. She then claimed that Jessica was sexually abused by Mr. Vargas, Dare mentor Leslie Vargas’s husband. Audrey also claimed that Jessica was sexually abused by Mr. Santiago, Dare mentor Ruth Santiago’s husband. Audrey claims that Jessica told her she was abused by Mr. Santiago, and she reported these claims to DSS and Dare. Jessica did not inform DSS that she has been abused by Mr. Santiago. Audrey also claims that while Jessica was living with Valerie Savoie, Jessica did not attend school, was threatened by Ms. Savoie’s son with a fork, and that a man who lived in the home would stand in the doorway and watch Jessica sleep. Audrey claims that she learned of these events while Jessica was living with Ms. Savoie. However, Dare never received any reports of physical abuse while Jessica was placed with Dare. Defendant Chapman also did not receive any reports of abuse.
Jessica was placed at Hillcrest on March 31, 2000. Hillcrest specializes in the treatment of children with aggressive and sexually reactive disorders. Hillcrest is an independent treatment center and DSS is not involved in the training, supervision, or approval of Hillcrest employees. However, children placed at DSS by Hillcrest are considered to be in DSS custody. Defendant Priscilla Hayes, the DSS social worker assigned to Jessica’s case at this time, regularly met with Defendant Amy Tunis, the Hillcrest clinician assigned to Jessica’s case to make sure Jessica’s needs were being met. Defendants Tunis and Hayes also regularly met with Audrey. The Hillcrest defendants claim that while Jessica exhibited some progress in the first few months that Jessica was at Hillcrest, Audrey’s actions affected their ability to properly care for Jessica. Audrey claims that DSS and Hill-crest employees continuously prevented her from seeing Jessica, and that they unfairly and unnecessarily restricted her access to Jessica.
Audrey complained about a number of incidents that occurred at Hillcrest. On two occasions, Jessica was given the wrong medication by Hillcrest employees in the presence of Audrey. Jessica did not take this medication and was not harmed by either incident. Once, on June 2, 2000, Jessica was inadvertently administered an antipsychotic medication by a Hill-crest nurse prior to a Rogers hearing, which is required before such a drug can be administered. Jessica had been taking this medication regularly prior to being admitted to Hillcrest. Audrey acknowledged that the harm to Jessica would have been the same whether the medication was administered before or after the hearing. On June 20, 2000, the Juvenile Court ordered the administration of the antipsychotic medica *504 tion after a Rogers hearing. Audrey did not object to the court’s order.
On November 28, 2000, Audrey informed defendant Hayes that a Hillcrest staff member was inappropriately disciplining the children, including Jessica, and allowed the children to touch his chest. As a result, a meeting was held. The Hillcrest staff member denies any such occurrence. Audrey claims that the staff member took a short leave of absence, and Jessica believes the employee was fired.
On three separate occasions, Hillcrest recommended that Jessica be discharged. On June 1, 2000, Hillcrest informed DSS that it was giving its thirty-day notice of discharge with respect to Jessica. Hillcrest informed DSS that Audrey was not complying with the program. Specifically, Hillcrest complained that Audrey frequently expressed her belief that residential treatment was not necessary for Jessica. Audrey felt that Jessica did not belong at a residential treatment facility and claimed that Hillcrest and DSS were conspiring to keep her away from Jessica. Audrey eventually expressed interest in cooperating with Hillcrest after an independent evaluation concluded that Jessica was in need of residential placement, and Hillcrest agreed to temporarily hold off on the discharge.
By November 2000, Jessica’s behavior was improving and Hillcrest again recommended that she be discharged. However, Jessica was not discharged because DSS expressed some uncertainty as a result of a recent downturn in Jessica’s behavior, including one incident of sexually inappropriate touching between Jessica and a few of her female peers in a “tent” that the children had constructed. It was later determined that the three girls involved planned this incident at a specific time when Hillcrest staff would not be looking or were busy with other children. Additionally, Jessica was found abusing herself on a number of occasions. Hillcrest employees believe that Jessica did this intentionally to create bruises that she would later claim were inflicted by Hillcrest employees. On at least one occasion, Hillcrest employee defendant Maighan McKie had to physically restrain Jessica to prevent her from hurting herself.
On January 12, 2001, Hillcrest again suggested that Jessica be released. DSS issued its approval and on February 16, 2001, Hillcrest discharged Jessica to Audrey.
After Jessica was discharged from Hillcrest, Audrey alleged that Jessica was sexually abused while in a foster home. According to a report dated June 25, 2001, Jessica told Audrey that she had been raped while at a Leominster foster home in the summer of 1999. In July 2001, DSS investigated the report and the allegations were found to be unsupported.
As a result of these claims, and the ongoing disputes between Audrey and DSS, Dare, and Hillcrest regarding Jessica’s treatment, the plaintiffs filed this action on December 2, 2002.

DISCUSSION

I. Summary Judgment Standard

This court shall grant summary judgment when the material facts are undisputed and the movant is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Casseo v. Comm’r of Correction, 390 Mass 419, 422 (1983); Commonwealth Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party shoulders the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitled the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of their case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourovacilis v. Gen. Motors Corp., 410 Mass. 706, 716 (1991).

II. DSS Defendants

As to the DSS defendants, the plaintiffs allege negligent placement, negligent supervision, false imprisonment, intentional interference with parental rights, loss of consortium and violations of the Massachusetts Civil Rights Act.
A. Negligent Placement, Negligent Supervision, and Loss of Consortium Claims Arising Before December 13, 1999
The DSS defendants claim that the plaintiffs’ negligent placement, negligent supervision, and loss of consortium claims arising prior to December 13, 1999, are barred by operation of G.L.c. 258, §4, which requires a plaintiff who brings a cause of action against a public employer, such as DSS, to first present her claim in writing to the executive officer of the public employer within two years after the date of the cause of action arose. The plaintiffs’ presentment letter was not presented to DSS until December 13, 2001, which DSS claims is more than two years after the plaintiffs knew of the incidents giving rise to their claims.
Pursuant to the discovery rule, a cause of action accrues when a reasonable person in the plaintiffs position has discovered or should have discovered that she had been harmed or may have been harmed by the defendant’s conduct. Mohr v. Commonwealth, 421 Mass. 147, 156 (1995); Bowen v. Eli Lilly & Co., 408 Mass. 204, 205-06 (1990). Therefore, the plaintiffs had two years from the date they discovered that Jessica had been harmed by DSS to issue DSS a presentment letter.
A number of the plaintiffs’ claims did in fact arise prior to December 13, 1999. According to her deposition, Audrey learned that Jessica had been diagnosed with a vaginal wart, on October 21, 1999, and opined that she must have gotten it from one of the Dare homes in which she was placed. Immediately after *505 making this discovery, Audrey claims that Jessica told her she had been sexually abused by Mr. Vargas and Mr. Santiago, and that Jessica was mistreated while living with Valerie Savoie. She also testified that Jessica told her she was being abused while she was still living in the Santiago home, and Jessica lived at the Santiago home between August and September of 1999. Audrey’s testimony therefore indicates that she knew of at least some wrongdoing by October 21, 1999 at the latest, and as early as August 1999. Therefore, under G.L.c. 258, §4, the plaintiffs had two years from October 21, 1999 to issue a presentment letter to DSS. As previously stated, the plaintiffs issued their presentment letter to DSS on December 13, 2001, more than two years after the initial discovery of the harm. Accordingly, all of the plaintiffs’ allegations which arose between August and October of 1999 are barred as matter of law and must be dismissed.

B. Negligent Placement

The plaintiffs claim that DSS was negligent in placing Jessica in Dare mentor homes and at Hillcrest. Specifically, the plaintiffs claim that DSS’s failure to ensure that the Dare homes and Hillcrest were safe places for Jessica resulted in her being subjected to abuse and a worsening of her behavioral and emotional difficulties.
DSS claims that the plaintiffs’ negligent placement claim must be dismissed because it is barred by the discretionary function immunity provided by G.L.c. 258, §10(b), which immunizes public employers from “any claim based on the exercise or performance . . . of a discretionary function or duty [by a public employer], acting within the scope of his office or employment, whether or not the discretion is abused.”
This same issue was presented in another venue of this court in the case of Archer v. Dare Family Services, Inc., Civil No. 04354 (Middlesex Super.Ct.) [14 Mass. L. Rptr. 375]. On February 4, 2002, a decision of the court, Hely, J., was entered by which the court determined that DSS is entitled to immunity on such a negligent placement claim. Judge Hely concluded that decisions by DSS on the appropriate foster care placement for a child “inherently involve difficult choices” and “are precisely the type of discretionary decisions that the Legislature intended to protect from liability” by means of section 10(b). This decision was reached after the case was analyzed in accordance with a two-part test to determine whether a public employer is entitled to discretionary function immunity under G.L.c. 258, §10(b). See Sena v. Commonwealth, 417 Mass. 250, 255-57 (1994). First, the court must determine whether the public employer had “any discretion at all as to what course of conduct to follow.” Id., citing Sena v. Commonwealth, 417 Mass. 250, 255 (1994). Second, the court must determine “whether the discretion that the actor had is that kind of discretion for which § 10(b) provides immunity from liability.” Id. The SJC has held that section 10(b) provides immunity for discretionary actions based on considerations of, and that necessarily affect, public policy.
This court finds Judge Hely’s reasoning persuasive. DSS must be able to freely exercise its discretion when making often difficult and complex decisions about child placement without fear of liability. Moreover, similar considerations were the basis of the court’s decision involving the formulation of and actions pursuant to “individualized education plans” for a special needs student, including placement decisions. In Bencic v. City of Malden, 32 Mass.App.Ct. 186 (1992), the court observed that such placement decisions “relies upon the expertise of local educators to establish academic standards and provide special educational services . . . The application of such expertise in evaluating each child’s needs and developing individualized educational programming is indistinguishable in nature from the ‘high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning . . .’ ” [citations omitted] at 187-88. Therefore, DSS is immune from liability on the plaintiffs’ negligent placement claim.
Further, the record indicates no negligence on behalf of DSS in placing Jessica in the Dare homes or at Hillcrest. DSS has shown that it conducts thorough investigations of prospective Dare homes before placing a child. Similarly, DSS has demonstrated that it has frequently placed children exhibiting similar problems as Jessica at Hillcrest, and that Hillcrest was indeed a proper placement for someone with Jessica’s behavioral and emotional difficulties. The plaintiffs reliance upon Bonnie W. v. Commonwealth, 419 Mass. 122 (1994), is misplaced. There, the commonwealth’s employee, a parole officer, had prior knowledge of the criminal convictions of the third-party wrongdoer and was alleged to have failed to provide adequate supervision and/or warning. The grant of summary judgment was vacated in part, not due to a belief that discretionary function did not apply but rather on the ground that the parole officer had misrepresented the level of risk to the manager of a trailer park which thus permitted the convict’s continued employment there and access to its residents. The lack of similarity between these cases is substantial; the defendants herein had no such knowledge or forewarning. The plaintiffs have not met their burden in countering DSS’s showing. Kourovacilis, 410 Mass. at 716. It follows that summary judgment must enter in favor of DSS on the negligent placement claim.

C. Negligent Supervision

The plaintiffs also claim that DSS was negligent in its supervision of the individuals that allegedly abused and injured Jessica while she was living in the Dare homes and at Hillcrest. These individuals include Mr. Vargas, Mr. Santiago, and staff members at Hillcrest.
It appears that the plaintiffs contend that DSS’s duty to supervise Mr. Vargas and Mr. Santiago arises out of an employer/employee relationship that existed between DSS and those who live in the foster homes in which the *506 children are placed. While G.L.c. 258, §1 does include “approved or licensed foster caregivers” within its definition of public employees, this definition cannot be read to include every person that lives in a foster home. Rather, foster caregivers, or foster parents, are generally defined as people who “act in a parental capacity because of a temporary contractual agreement with the state.” Kerins v. Lima, 425 Mass. 108, 111 (1997). Here, there was no contractual agreement with Mr. Vargas or Mr. Santiago. Rather, DSS contracted with Dare, who in turn contracted with Mrs. Vargas and Mrs. Santiago, as licensed mentors, to temporarily act as parents to Jessica. The plaintiffs have not provided any evidence or authority that DSS had a duty to supervise every person living in the Dare homes. Therefore, DSS cannot be held liable for any acts allegedly committed by Mr. Vargas or Mr. Santiago.
It is clear that DSS owes a duty of care to children in its custody. However, the Appeals Court has held that state agencies cannot be held liable for the acts of independent contractors to whom the state agencies have delegated this duty of care. Thornton v. Commonwealth, 28 Mass.App.Ct. 511, 514 (1990). In Thornton, the Department of Youth Services (“DYS”) placed ajuvenile with an independent contractor. While on a field trip with the independent contractor, the juvenile died, allegedly as a result of the negligence of one of the independent contractor’s employees. Id. at 512. The court held that DYS “did not have a nondelegable duty of care,” and that DYS could be found liable “only if [a jury) found that the employees of [the independent contractor] were subject to the direction and control of DYS.” Id. at 514. In other words, DYS could not be held liable for the negligent conduct of an employee of an independent contractor.
The facts in Thornton are analogous to the situation in the present case. As in Thornton, DSS delegated its duty of care to Hillcrest, an independent contractor that provided services separate from DSS. The Hillcrest Placement Agreement states that Hillcrest’s employees were responsible for providing services to Jessica, and there is no evidence that Hillcrest operated at the control or direction of DSS. Accordingly, pursuant to the Appeals Court’s holding in Thornton, DSS cannot be held liable on a claim of negligent supervision with regards to the actions of Hillcrest employees:
Moreover, the facts at bar and as discussed above support the claim by the DSS defendants that the immunity of G.L.c. 258, §10(j) applies, that the Hillcrest and Dare defendants are neither DSS employees nor are they parties for whom the DSS is legally responsible, nor are DSS employees original actors who caused harm to the minor plaintiff. In this regard, the facts of this case are sufficiently similar to those in Brum v. Town of Dartmouth, 428 Mass. 684 (2002), upholding the application of this section of the statutory public duty immunity to the acts and/or omissions of school officials in failing to protect a student from the harmful and original actions of third parties for whose conduct the school was not responsible. The claim must be dismissed.
D. Intentional Torts
Jessica alleges that defendants Chapman, Billings, Hayes, and Hazelton falsely imprisoned her by keeping her in DSS custody in foster homes and institutions. Additionally, Audrey claims that DSS intentionally interfered with her parental rights by “enticing” Jessica to leave Audrey’s home or inducing her to stay away from Audrey.
To establish a claim for false imprisonment, a plaintiff must show that the defendant engaged in intentional, unlawful confinement, directly or indirectly, by force or threat, and that the plaintiff was conscious of or harmed by the confinement. Cremaldi-Vickery v. Otis Elevator, Inc., 57 Mass.App.Ct. 1105 (2003). Jessica cannot establish the first element of the tort as her “confinement” was lawful. As of April 6, 1999, when DSS picked Jessica up from school after receiving temporary custody, DSS was lawfully in custody of Jessica. Prior to that date, Jessica was placed in foster homes and institutions pursuant to voluntary contractual agreements entered into between DSS and Audrey. Where a person is authorized by statute to confine an individual, there can be no false imprisonment claim. Doggett v. Hooper, 306 Mass. 129, 133 (1940). Pursuant to G.L.c. 119, §1, DSS is authorized to take custody of a child if a court so orders. The Fitchburg District Court concluded that DSS should take custody of Jessica as of April 6, 1999, thereby authorizing DSS’s alleged “confinement” of Jessica. As DSS’s custody of Jessica was lawful, there can be no false imprisonment claim.
For similar reasons, Audrey’s intentional interference with parental rights claim must also fail. In Murphy v. I.S.K. Con. of New England, Inc., the SJC recognized the tort of intentional interference with parental rights to include abduction from a parent who has legal custody, enticement to leave the parent’s home, and harboring a child by inducing or encouraging a child not to return to the home of the parent who has legal custody of her. 409 Mass. 842, 859 (1991). Again, as of April 6, 1999, DSS was the legal custodian of Jessica. DSS could not have abducted Jessica, or enticed her to leave Audrey’s home, or “harbored” her in an effort to prevent her from returning to Audrey’s home, as Audrey did not have legal custody of her. Therefore, DSS is entitled to summary judgment on this claim.

E. Civil Rights Violations

Audrey also claims numerous civil rights violations under the Massachusetts Civil Rights Act. She claims that defendants Chapman and Billings, as social workers at DSS, violated her civil rights by taking Jessica away from her, and by using threats, intimidation, and coercion against her while assigned to Jessica’s case. Specifically, Audrey claims that defendants Billings and Chapman made false statements in their affidavits to the Fitchburg District Court on April *507 6, 1999, when the Fitchburg District Court first awarded DSS temporary custody.
Audrey’s civil rights claim against these defendants is barred by the statute of limitations. There is a three-year statute of limitations on claims brought under the Massachusetts Civil Rights Act. Pagliuca v. Boston, 35 Mass.App.Ct. 820, 822-23. The limitations period begins to run on the date of the allegedly wrongful acts. Flynn v. Associated Press, 401 Mass. 776, 781 (1988). As previously stated, Audrey became aware of the removal of Jessica from her custody on April 6, 1999. Audrey alleges that the wrongdoing committed by defendants Billings and Chapman occurred while they were assigned to Jessica’s case, and does not show any evidence of wrongdoing after November 1999. Audrey did not file her complaint until December 2, 2002, more than three years after the acts of which she complains. Therefore, her claim against defendants Billings and Chapman is barred by the statute of limitations.
As to defendants Hazelton and Hayes, Audrey has not provided any evidence that any of these defendants engaged in “threats, intimidation or coercion” as required by the Massachusetts Civil Rights Act, G.L.c. 12, §11.
Jessica also claims that the DSS defendants violated her civil rights by depriving her of her substantive due process right to be free from harm while in DSS custody. The evidence in support of this claim consists of the administration of the wrong medication, the use of restraints, the inappropriate sexual touching between Jessica and her peers, the inappropriate actions of a staff member, and the use of restraints at Hillcrest, as well as the alleged abuse that she suffered while at various Dare homes.
The facts do not support a claim that any of the DSS defendants caused Jessica harm while she was at Hillcrest or at the Dare homes. If the plaintiffs have a claim for civil rights violations at all, the appropriate defendants are the Hillcrest and Dare defendants. The claim against the DSS defendants must be dismissed.

F. Loss of Consortium

An action for loss of consortium is dependent on the defendant’s liability for an underlying tort which causes injury to the plaintiff. New England Mut. Life Ins. Co. v. Liberty Mut Ins. Co., 40 Mass.App.Ct. 722, 727 (1996). As the plaintiffs have not established the DSS defendants’ liability on any of their claims, they do not have a claim for loss of consortium. The DSS defendants are entitled to summary judgment on this claim as well.

III. Hillcrest Defendants

As to the Hillcrest defendants, the plaintiffs allege intentional interference with parental rights, negligence, negligent supervision/respondeat superior, false imprisonment, assault and battery and loss of consortium.

A.Civil Rights Violations

Audrey claims that the Hillcrest defendants violated her civil rights in continuously preventing Jessica from being with Audrey, thereby violating her right “to be free from unreasonable restraint to be with her family.”
To establish a claim under the Massachusetts Civil Rights Act, a plaintiff must show that (1) her exercise or enjoyment of rights secured by the Constitution or laws of the Commonwealth have been interfered with, or attempted to be interfered with, and (2) that the interference or attempted interference was accomplished by “threats, intimidation or coercion.” Doe v. Senechal, 66 Mass.App.Ct. 68, 79 (2006); Reproductive Rights Network v. President of the Univ. Of Massachusetts, 45 Mass.App.Ct. 495, 505 (1998). Under this analysis, a “threat” is defined as “the intentional exertion of pressure to make another fearful or apprehensive of injuiy or harm,” and “intimidation” is defined as putting a person in fear for the purpose of compelling or deterring conduct. Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467, 474 (1994). For “coercion” to occur, the defendant must apply force against the plaintiff, which, viewed objectively, would prevent the plaintiff from exercising, or deprive the plaintiff of a constitutional right. Id., see also Ayalsi v. Armstrong, 56 Mass.App.Ct. 740, 749 (2002).
Hillcrest could not interfere with Audrey’s “right to be with her family” because for the time period when Jessica was living at Hillcrest she was in the custody of DSS, and Audrey did not have custodial rights to her. In fact, the record indicates that Hillcrest, on three occasions, requested that Jessica be discharged to Audrey’s custody. On one of these occasions, Audrey requested that Jessica remain at Hillcrest. Additionally, Hillcrest was powerless to discharge Audrey without a court order and DSS approval.
Further, Audrey has provided no evidence showing that any Hillcrest defendants engaged in threats, intimidation, or coercion as required by G.L.c. 12, §11. For these reasons, this claim must fail.

B. False Imprisonment

Jessica’s false imprisonment claim against the Hillcrest defendants fails for the same reason as it did against the DSS defendants. An essential element of a claim for false imprisonment is the unlawful confinement of the plaintiff. Ortiz v. Hampden County, 16 Mass.App.Ct. 138, 140 (1983). As previously stated, there was nothing unlawful about Jessica’s “confinement” at Hillcrest. She was placed there pursuant to the discretion of DSS, who had legal custody of her. The Hillcrest defendants are therefore entitled to summary judgment on this issue.

C.Intentional Interference With Parental Rights

Audrey’s intentional interference with parental rights claim against the Hillcrest defendants also fails for the same reason it did against the DSS defendants. While Jessica was living at Hillcrest, she was in DSS custody, and Audrey did not have custodial rights to Jessica. Therefore the Hillcrest defendants could not have pre *508 vented Jessica from returning to Audrey’s home. There is no evidence that the Hillcrest defendants abducted, enticed, or harbored Jessica, and as mentioned above, Hillcrest was active in seeking that Jessica be discharged, and attempted to release her three times. The evidence does not support a claim of intentional interference with parental rights. This claim must be dismissed.
D. Negligence/Negligent Supervision
The plaintiffs’ negligence claim is specifically directed at two of the Hillcrest defendants, defendant Tunis and defendant Cusson, and refers to two separate incidents that occurred while Jessica was at Hillcrest: the November 19, 2000 inappropriate touching incident between Jessica and her peers; and the June 1, 2000 incident where Jessica was administered anti-psychotic medication prior to a Rogers hearing.
A plaintiff proves negligence by showing that the defendant owes a duty, that the defendant breached that duty, that the plaintiff suffered damages as a result of the breach, and that the breach was the actual and proximate cause of the plaintiffs injuries. Coughlin v. Titus & Bean Graphics, Inc., 54 Mass.App.Ct. 633, 638 (2002). A caregiver at an institution such as Hillcrest owes a duty that includes “preventing self-abusive or self-destructive acts” by a patient. See McNamara v. Honegman, 406 Mass. 43, 55 (1989).
Defendants Tunis and Cusson owe children in their care a duty to prevent them from harming themselves. The defendants’ actions on November 19, 2000, however, do not rise to the level of a breach of that duty. Hillcrest’s investigation into the incident revealed that the children involved conspired to engage in the inappropriate touching at a specific time when the staffs attention was demanded elsewhere. The defendants cannot be expected to prevent every incident before it happens. Imposing such a burden on caregivers would be unreasonable.
The other ground for the plaintiffs’ negligence claim is the June 1, 2000 incident, where Jessica was inadvertently administered anti-psychotic medication prior to a Rogers hearing. While such action could certainly be considered a breach of duty, the plaintiffs cannot prove that Jessica experienced any injury as a result of the mistake. Jessica had been regularly taking the medication before she was admitted to Hillcrest, and Audrey admitted that any harm Jessica might have suffered would have been the same regardless of when Jessica took the medication. Further, Audrey did not object to the court’s order that Jessica be administered the medication after a Rogers hearing was conducted. Therefore, the plaintiffs have failed to prove that Jessica was injured as a result of the defendants’ actions.
Because the plaintiffs have failed to show that defendants Tunis and Cusson breached their duly with respect to the inappropriate touching incident, and because there is no evidence that Jessica was harmed as a result of the medication incident, their negligence claim must fail. It follows that where the underlying negligence claims fails, the plaintiffs’ negligent supervision/respondeat superior claim also fails. Defendants are entitled to summary judgment on these claims.
E. Assault and Battery
The plaintiffs allege a claim of assault and battery against defendant Maighan McKie, a Hillcrest employee who physically restrained Jessica in August 2000 after an incident at Hillcrest.
The elements of the intentional tort of assault and battery are present when (1) a defendant acts intending to cause a harmful or offensive contact with the plaintiff, or an imminent apprehension of such contact; and (2) a harmful contact with the plaintiff directly or indirectly results. See Restatement (Second) of Torts §13 (1965). Here there is no evidence that defendant McKie intended to cause a “harmful or offensive contact” with Jessica. Rather, the record indicates that defendant McKie was forced to restrain Jessica to prevent her from harming herself, which this record suggests she would often do to get the Hillcrest employees “in trouble.” Without this essential element of the tort, the assault and battery claim fails.
E Loss of Consortium
As previously stated, a loss of consortium claim cannot stand on its own, and is dependent upon a showing of a tortious act which caused primary injury to the plaintiff. Mouradian v. Gen. Elec. Co., 23 Mass.App.Ct. 538, 544 (1987). As the plaintiffs have not established that any of the defendants are liable for any torts, this claim must also fail.

ORDER

It is hereby ORDERED that the defendants’ Motions For Summary Judgment are ALLOWED.

Misnamed in the original filings as “Megan McGee.”

The moving parties have also moved that the affidavit of Audrey Serrano should be stricken, on the ground that it is rife with improper hearsay, characterizations and conclusions; to the extent that the affidavit does not comply with Rule 56(e) of the Rules of Civil Procedure, the motions are allowed. The plaintiffs’ opposition, including the affidavit in question, was filed while they were represented by counsel.
Following the filing of the motions and oppositions at bar, a disagreement apparently arose between the plaintiffs and their counsel, who was thereafter permitted to withdraw. Subsequently, the plaintiff, Audrey Serrano filed a motion to supplement the opposition directly with the court that included what purports to be a substitute or supplemental affidavit in opposition to the motion, with attachments. It suffers from the same defects of which the parties complained and was not filed in accordance with the requirements of Rule 9A of the Superior Court. It is therefore stricken.

The adult plaintiff appeared and represented herself at the hearing, and was heard in opposition to the motion.